UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

8.08 cv 731-T 26TBm

Plaintiff,

Case No.

v.

SOUTHWESTERN MEDICAL
SOLUTIONS, INC., JOHN R. HEDGES,
RICHARD R. POWELL, AND
BASIL J. MEECHAM,

Defendants.

_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges and states as follows:

1.      The Commission brings this action to permanently restrain and enjoin Defendants Southwestern Medical Solutions, Inc., John R. Hedges, Richard R. Powell, and Basil J. Meecham (collectively "Defendants") from misleading and defrauding investors.   This Complaint arises out of false and misleading press releases concerning the regulatory approval status of Southwestern Medical Solutions, Inc.'s products and the receipt of a large customer order.

2.      Southwestern purports to be a medical device company that develops and manufactures diagnostic tests for the detection of infectious diseases including the HIV virus, the hepatitis E and B viruses, the T-cell leukemia virus, and malaria.

3.      From at least January until late August 2006, Southwestern issued several false and misleading press releases claiming: the Food and Drug Administration ("FDA") had approved

its Labguard diagnostic testing device; the company had received an order for several thousand units of the Labguard device; and Southwestern had pending patents and trademarks with the U.S. Patent and Trademark Office.

    4.      Additionally, Southwestern submitted a false and misleading Rule 15c2-11 Information and Disclosure Statement ("Information Statement") that contained core information about the company's business and allowed its stock quotes to appear on the Pink Sheets, an inter-dealer electronic quotation and trading system in the over-the-counter securities market.

    5.      Hedges, Powell, and Meecham, all officers or directors of Southwestern, were responsible in various capacities for preparing and disseminating the false press releases and the Information Statement.

    6.      The false press releases significantly increased the market demand for Southwestern's stock. While the Defendants were disseminating them, the company's stock price increased as much as 56 percent in a single day and daily trading volume increased by as much as 214 percent.

    7.      By engaging in this conduct, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 , 17 C.F.R. §240.10b-5.

## DEFENDANTS

    8.      Southwestern is a Florida corporation that identifies a Tampa, Florida post office box as its corporate address. The company has no employees, no revenues, and does not maintain a physical office space. During the time period of the conduct alleged in this complaint, the company was quoted on the Pink Sheets under the ticker symbol "SWNM." On September 11, 2006, the Commission suspended trading in Southwestern's stock because of

concerns over the veracity of the same public statements at issue in this Complaint. The company's stock currently trades infrequently and is not quoted or traded on an exchange or inter-dealer quotation system.

9.     Hedges is a resident of Tucson, Arizona.  He has been Southwestern's president, chief executive officer, treasurer, and a director since 2004.  Hedges approved the company's false and misleading press releases before dissemination and also reviewed and signed the Information Statement.

10.    Powell is a resident of Tampa, Florida.  He has been Southwestern's Vice President of New Product Development and a director of the company since 2004.  Powell provided the content and subject matter of the press releases containing false and misleading information about the company and also provided some of the false information in the Information Statement.

11.    Meecham is a resident of Orlando, Florida.  He has been a director of Southwestern since 2004.  Meecham routinely discussed the press release content with Powell, reviewed the revised press releases, and ultimately submitted the press releases to the wire services for publication.  He also prepared substantially all of Southwestern's Information Statement.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

13.    This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida.  Meecham and Powell reside in the Middle District.  Powell is the company's registered agent and Southwestern listed a Tampa, Florida address for its corporate

office. Thus, the Defendants' acts and transactions constituting violations of the Exchange Act occurred in the Middle District of Florida.

14.     The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint. Specifically, Southwestern issued the press releases over media wire services, its stock was quoted on the Pink Sheets and traded on the over-the-counter telephone and computer broker-dealer network. Furthermore, the individual Defendants used email and other means of telephone and electronic communication to create and disseminate Southwestern's false press releases and Information Statement.

## SOUTHWESTERN'S BUSINESS

15.     Southwestern is a development-stage company that purportedly targets the medical device business. The company claims it intends to provide the healthcare industry with significant advancement in medical supplies and equipment through internal research and development as well as acquisition of proprietary technology.

16.     In 2006, Southwestern identified its first product, the Labguard system, as a proprietary medical diagnostic device that eliminated the problems associated with patient fluid collection methods and diagnostic testing.

17.     The company, however, had not completed development of the Labguard system and did not have the funding necessary to complete development.

18.     Furthermore, Southwestern never received, or even applied for, FDA approval to market the Labguard system or any other product for sale in the United States, and did not have a

patent or trademark pending as of September 11, 2006, when the Commission suspended trading in the company's securities.

## THE DEFENDANTS ISSUED FALSE AND MISLEADING PRESS RELEASES

19.     Despite the incomplete development status of its signature product, beginning no later than January 2006 and continuing through at least August 2006, Southwestern issued at least 21 press releases touting its Labguard system and other purported products and business prospects.

20.     Powell provided the subject matter and content for these press releases and sent them to a business writer who drafted the releases for publication.  Powell and the business writer then circulated the press releases to Hedges and Meecham for review and approval before the company issued them.   Powell and Meecham shared responsibility for ensuring the information contained in Southwestern's press releases was true and accurate.  Hedges reviewed and approved the press releases but failed to take any steps to ensure the information was accurate.  Meecham ultimately submitted the press releases to wire services for publication.

21.     On January 17, 2006, Southwestern in one press release announced its application for "waived" status of the Labguard device under the Clinical Laboratory Improvement Amendments, a method by which companies may avoid the FDA review and approval process for certain simple products.  Waived status would have eliminated the Labguard device from further regulatory oversight.

22.     The press release was false, however, because Southwestern never applied to the FDA for waived status.  The press release, which identified Powell as the company contact, also indicated the United States Patent and Trademark Office had issued a trademark for the product,

referring to it as "Labguard™." This was false because Labguard had never been approved for a trademark.

23.     Powell, Meecham, Hedges and Hedges' wife were the only officers and directors of Southwestern, and the company had no employees. Southwestern conducted board meetings where Powell, Meecham, and Hedges discussed product development, and the three frequently discussed the progress of development between board meetings. Thus, Powell, Meecham and Hedges knew Southwestern had not completed development of the Labguard device as of January 17, 2006, and therefore knew the Labguard name was not trademarked and the company could not apply for waived status under the Amendments.

24.     On February 6, 2006, Southwestern issued another press release claiming a Florida-based medical supply company had ordered several thousand Labguard units. The release further stated Southwestern had received the order immediately following the January 17 release announcing the completion and market readiness of Labguard.

25.     This press release was false because the purchase order was dated almost a full year before the press release. It was additionally misleading because the Florida-based medical supplier had conditioned its order on Labguard's approval for sale to the public. At the time, Labguard was not approved for sale to the public since Southwestern had not started, much less completed, the FDA's required premarket review and approval process.

26.     Because they were entirely responsible for Southwestern's operations, Powell, Meecham and Hedges knew the purchase order predated the press release by almost a year, knew Labguard was not approved for sale to the public, and knew the company could had not completed development of the Labguard device as of February 6, 2006.

27.     On February 27, 2006, Southwestern issued another press release, in which it announced it had received "further FDA compliance certification" for an additional product line that would enable the company to sell this product line through licensed healthcare professionals. The FDA, however, had not certified any Southwestern product line and Southwestern had not applied for such approval.

28.     Again, because of their responsibilities for operating Southwestern, Powell, Meecham and Hedges knew Southwestern had not received any FDA compliance certification and knew the company had not completed the development of any product line as of February 27, 2006.

29.     Another press release, issued on August 28, 2006, claimed Southwestern had engaged in extensive negotiations for joint marketing agreements with overseas suppliers and packaging firms and within two weeks would launch multiple medical testing products for marketing exclusively to the international medical markets.

30.     Powell, Meecham and Hedges, however, knew Southwestern could not make good on the representation it would launch medical testing products for marketing because they knew the company did not have sufficient funding to complete development of any of its product lines as of August 2006.

## THE PRESS RELEASES MATERIALLY AFFECTED THE MARKET

31.     Investors responded to these press releases. The trading day after each false and misleading press release, Southwestern's stock price and trading volume increased significantly.

32.     Specifically, on January 17, 2006, the stock price increased by more than 56 percent. It further increased by 28 percent the next day while trading activity increased more than 214 percent, trading almost 4.6 million shares.

33.     The day after the February 6, 2006 press release, Southwestern's stock price rose more than 9 percent as trading volume more than doubled, from less than 500,000 to more than 1 million shares traded.   Similarly, the day after the February 27, 2006 press release, trading volume also doubled while the stock price increased approximately 19 percent.

34.     Finally, the daily trading volume spiked from approximately 132,000 shares to more than 1 million shares following the August 28, 2006 press release.

## SOUTHWESTERN SUBMITTED A FALSE INFORMATION STATEMENT

35.     On March 13, 2006, Southwestern submitted the Information Statement to the Pink Sheets.   The Information Statement disclosed core information about the company's business and allowed quotations for Southwestern's stock to appear on the Pink Sheets website.

36.     The Information Statement repeated the false claims about the pending patent and trademarks of Southwestern's Labguard device.   At that time,   however, Southwestern had not submitted any patent or trademark applications.   Although Powell had submitted a trademark application for a product called "Labguard Accucheck" on September 29, 2004, under trademark serial number 78491185, he had abandoned the filing in November 2005 and the trademark was never issued.

37.     Additionally, the Information Statement stated there were no "existing or probable governmental regulations affecting or pertaining to" Southwestern's business.   To the contrary, Southwestern required FDA approval of its Labguard device before the company could market it for sale.

38.     Meecham drafted substantially all of the Information Statement, which he based in part, on information he received from Powell and Hedges.   On January 17, 2006, Hedges edited, reviewed and ultimately signed the Information Statement.

39.     Powell, Meecham and Hedges knew the company had no pending patents or trademarks and the Labguard device, once completed, would require FDA approval.

## COUNT I

### FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

40.     The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint as if fully set forth herein.

41.     From at least January 17, 2006 through August 2006, the Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.  By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Permanent Injunctive Relief

Issue a Permanent Injunction, restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with

them, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## II.

### Penalties

Issue an Order directing Hedges, Powell, and Meecham to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## III.

### Penny Stock Bar

Issue an Order, pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), permanently barring Hedges, Powell, and Meecham from participating in an offering of penny stock.

## IV.

### Officer & Director Bar

Issue an Order pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Hedges, Powell, and Meecham from serving as an officer or director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(d) or 15(d) of the Exchange Act, 15 U.S.C. §§ 78l(b) and (g), and § 78o(d).

## V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

April _15_, 2008

By: _Brian X. Barry_

Brian K. Barry
Senior Trial Counsel
Florida Bar No. 0632287
Direct Dial: (305) 982-6382

Attorney for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154